Abram MOSKOWITZ,
Plaintiff-Respondent,

v.

The EQUITABLE LIFE ASSURANCE
SOCIETY OF the UNITED STATES,
Defendant-Appellant.

No. 59552.

Supreme Court of Missouri,
en banc.

Dec. 13, 1976.

**14**

Edward K. Fehlig, Clayton, for defendant-appellant.

Timothy V. Barnhart, St. Louis, for plaintiff-respondent.

FINCH, Judge.

This is an action on a group major medical expense policy to recover the cost of nursing care provided to plaintiff's wife by a licensed practical nurse. Plaintiff, husband of the recipient of the nursing care, obtained a verdict for $3,150.00. The judgment was affirmed on appeal by the Mis-

souri Court of Appeals, St. Louis District. On application of defendant (sometimes referred to herein as Equitable), we ordered the case transferred and we now decide it as though here on direct appeal. Mo.Const. art. V, § 10. We reverse.

Equitable, on the application of Beacon Shoe Company, Inc., issued for the period from October 1970 through December 1971 a major medical insurance policy which provided certain coverage for Beacon's employees and their dependents. It included a rider captioned "Special Plan for Medicare Participants" which, in pertinent part, was as follows:

"Upon receipt of due proof that an employee or an employee's dependent while insured for benefits under this rider, shall have incurred 'covered medical expenses' (defined below) on account of a non-occupational accidental bodily injury or a non-occupational sickness and that such covered medical expenses during a calendar year exceed the deductible amount (defined below), the Society shall, subject to the other provisions of this rider and to the provisions of this policy, pay to the employee an amount of benefits equal to 80% of such excess covered medical expenses incurred during such calendar year provided that the total amount of benefits payable with respect to any person while insured for benefits under this rider shall in no event exceed $5,000 (herein referred to as the Special Plan Maximum).

"DEFINITIONS:

"For the purposes of insurance under this rider, the following definitions shall apply:

\*  \*  \*  \*  \*  \*

"2. COVERED MEDICAL EXPENSES. The covered medical expenses referred to herein shall consist of the following charges for services, supplies and treatment:

\*  \*  \*  \*  \*  \*

"b. Charges made for private nursing service by a Registered Professional Nurse (R.N.).

\*  \*  \*  \*  \*  \*

"LIMITATIONS:

"A. Covered medical expenses shall in no event be deemed to include expenses incurred

    \*    \*    \*    \*    \*    \*

"2. for services, supplies or treatment
"a. other than those prescribed as necessary (including the quantity and duration thereof) by a physician legally licensed to practice medicine and surgery . . . . .

    \*    \*    \*    \*    \*    \*"

Substantially the same language appeared in a descriptive brochure delivered to each Beacon employee covered by the policy.

Anna Moskowitz, plaintiff's wife, was a Medicare participant. Hence, the foregoing policy rider covering such persons was applicable to her. She was hospitalized in early May 1971 for Parkinson's disease. When she went home from the hospital on May 29, 1971, her condition made it dangerous for her to walk alone and her attending physician, Dr. Scheff, gave instructions for her to have continuous care.

Dr. Scheff confirmed his instructions concerning nursing care in a memo dated June 9, 1971. It stated: "I have deemed it necessary that Mrs. Anna Moskowitz should have, at all times, private duty nurses at her home due to her severe Parkinsonism. Because of the fact that there are no registered nurses available, practical nurses shall be used." In a handwritten postscript to the foregoing, the doctor added: "Practical nurses are adequate for her nursing care." This latter statement was confirmed by the testimony of Dr. Scheff when he stated that in his medical opinion it was not necessary to have a registered nurse to care for Mrs. Moskowitz.

With the exception of one registered nurse who spent one day caring for Mrs. Moskowitz, all other nurses obtained to provide private nursing care at home were licensed practical nurses. They gave orally the medicines prescribed by the doctor.

Sometime before her death in September 1972, Mrs. Moskowitz also received penicillin shots which were given by the nurse on duty. Other duties included feeding the patient, moving her from the bed to a walker or a wheelchair or the commode, bathing her and providing other bedside care.

During the period from May 1971 through December 1971,[1] plaintiff paid the sum of $6,498.00 for services of licensed practical nurses. The Medicare rider limited liability of the company for an insured to 80 per cent of covered medical expenses not to exceed $5,000 and the company was entitled to credit for $786.36 paid to plaintiff for expenses other than practical nursing services. The jury awarded plaintiff the sum of $3,150.

Equitable urges on appeal that the trial court should have sustained its motion for directed verdict because the plain and unambiguous language of the policy limited coverage for private nursing services to those provided by registered professional nurses (sometimes referred to herein as R.N.s). In response, plaintiff argues that (1) the language of the policy is ambiguous and should be construed as providing coverage for private nursing service by practical nurses, (2) an insurer is required to pay benefits under a medical expense policy where there has been substantial compliance with requirements specified in the policy and (3) the employment of licensed practical nurses when R.N.s were unavailable constituted substantial compliance with the policy provisions.

*Is the policy language with reference to coverage for charges for private nursing services ambiguous?*

■ It is plaintiff's position that the structure of the clause "charges made for private nursing service by a Registered Professional Nurse (R.N.)" makes it evident that the intent was to provide coverage for private nursing services in the home. He argues that the words used describe the

---

1. Beginning January 1, 1972, Beacon discontinued its policy with Equitable and purchased a policy from another company.

kind of *service* covered rather than limiting the persons who may perform those covered services. Additionally, he says that since the policy did not state whether persons other than R.N.s could perform the covered private nursing services, the policy is ambiguous. We disagree. The language is brief and precise. It says simply that covered medical expenses referred to in the policy include charges by R.N.s for private nursing service when prescribed as necessary by a physician legally licensed to practice medicine or surgery. How could it be stated any more clearly or exactly? When one states that an apple is red, he need not add that it is not green, brown, blue or any other color besides red. He says it all and he says it clearly when he says the apple is red. It wasn't necessary for Equitable to add that coverage would not apply if the private nursing services were performed by a practical nurse. It clearly and positively stated that the policy covered such nursing services when prescribed by the doctor and performed by an R.N. That is what it means. There is no room for any other reasonable interpretation of the language used.

If it had been the intention to cover private duty nursing in homes, irrespective of whether performed by R.N.s or practical nurses, there would have been no occasion to include language specifying coverage for such services by R.N.s. Instead, the language would have mentioned both kinds of nurses or neither. For example, on January 1, 1972, Beacon replaced the Equitable policy with one written by John Hancock. It was to provide coverage for private nursing services by R.N.s plus, in more limited circumstances, such services by practical nurses. It did not refer to only R.N.s. Instead, it specifically spelled out the coverage for services by both kinds of nurses in the following language:

"Private duty nursing service furnished in a hospital or elsewhere by a registered graduate nurse who is entitled to use the suffix R.N. after his or her name and private duty nursing service furnished by a registered or licensed practical nurse in a hospital (but not elsewhere) if the attending physician certifies in writing that a registered graduate nurse (R.N.) was not available, provided in any case that such nurse is one who does not ordinarily reside in the home of the employee and is not a member of the employee's immediate family (which for purpose of this coverage consists of the employee's wife or husband and the children, brothers, sisters and parents of the employee, and of the employee's wife or husband)."

Plaintiff next argues that there is coverage in this case for the reason that everything done for Mrs. Moskowitz by the practical nurses could have been done for her by R.N.s. He seeks to fortify this argument by pointing out that it was done at less cost to Equitable by reason of the fact that the per day charges by the practical nurses were less than charges by R.N.s would have been. In essence, this is simply a restatement of the argument already disposed of. It says that the policy covers all services which an R.N. may perform and if another (a practical nurse) performs some of those services, they are covered so long as a R.N. could have performed them.

This argument by plaintiff ignores the fact that there are substantial differences in qualifications[2] of R.N.s and practical nurses and in what they may do. The latter are spelled out in the following sections, § 335.010.2 being applicable to R.N.s and § 335.010.3[3] to practical nurses:

Sec. 335.010.2

"A person practices professional nursing who for compensation or personal profit performs, under the supervision and direction of a practitioner authorized to sign birth and death certificates, any professional services requiring the appli-

---

2. These, as they existed at the time of this case, are set out in §§ 335.040 and 335.060, RSMo 1969. These were subsequently amended. See RSMo Supp.1975.

3. These, as well as other statutory references, are to RSMo 1969 unless stated otherwise.

cation of principles of the biological, physical or social sciences and nursing skills in the care of the sick, in the prevention of disease or in the conservation of health."

Sec. 335.010.3

"A person practices as a licensed practical nurse who desires to and does comply with the licensing provisions of this chapter, and who for compensation or personal profit performs such duties as are required in the care of the sick, convalescent, chronically ill or aged or infirm patients and in carrying out such medical orders as may be prescribed by a practitioner authorized to sign birth and death certificates or under the supervision of a registered professional nurse requiring knowledge of nursing procedures, but not requiring the professional knowledge and skills required of the professional nurse, and who is licensed under this chapter."

In commenting on the role of the practical nurse, E. Hayt, L. Hayt, A. Groeschel & D. McMullan, Law of Hospital and Nurse, 23 (1958), says:

"The fundamental role of the licensed practical nurse is to provide nursing care to patients in those instances where the nursing needs do not require the constant attention of the professional nurse."

This statement is consistent with the language in § 335.010.3 which refers to performance by practical nurses of duties "in the care of the sick, convalescent, chronically ill or aged or infirm" under orders of an R.N. or a doctor, where the professional knowledge and skills of the R.N. are not required. That was the kind of care which Mrs. Moskowitz needed. This is clear from what the practical nurses did and is consistent with the directions and testimony of Dr. Scheff that practical nurses were adequate for her care and that it was not necessary

to have R.N.s. If Dr. Scheff had been of the opinion that R.N.s were necessary, it would have meant that nurses were needed who could do things which practical nurses were not authorized to do and in fact were prohibited from doing. Sections 335.020, 335.200. Since he did not deem the services of registered nurses to be necessary, he did not so prescribe. It would be illogical, as well as contrary to the clear language of the policy, to say that under such circumstances there still is coverage, simply because an R.N. could have done those things which the practical nurses did. This is especially true when we consider the fact that the care by practical nurses of convalescent, chronically ill or aged or infirm patients can go on for long periods of time and would materially increase the exposure of the insurer beyond what it would be if coverage is limited to private nursing services by R.N.s when prescribed by the doctor.[4]

■ As still another basis for construing the policy provision as covering private nursing services by practical nurses, plaintiff calls attention to evidence which he claims demonstrates that Equitable so interpreted its policy. He refers to testimony by Robert Tucker, an officer of Beacon and a grandson of plaintiff, that on a prior occasion Equitable paid to him under the same policy a claim for private nursing services by practical nurses. Those services were for his infant son who suffered from a neurological problem. Nursing care by R.N.s was prescribed as necessary by the attending pediatrician. Practical nurses were secured after efforts to obtain R.N.s were unsuccessful. Equitable concluded to and did pay $252 to Tucker but, in so doing, made clear its position that the policy did not cover such services, that an exception was being made and that no additional exceptions would be made in the future. The company's letter stated:

---

4. The testimony discloses that after plaintiff's employment of practical nurses was called to Equitable's attention and plaintiff and his son-in-law, president of Beacon, were informed that Equitable's policy did not cover such services, there was discussion of expanding coverage and Equitable offered to write a new policy

which would cover private nursing services by both R.N.s and practical nurses, retrospective to the time when plaintiff started hiring practical nurses. However, the premium for such expanded coverage was greater and Beacon never purchased such a policy.

" * * * The group policy provides for private duty nursing services only when they are prescribed as necessary and requires the special skills and knowledge that only a registered nurse (RN) can perform. An LPN does not possess the same knowledge and skills and therefore such services are not intended to be covered within the scope of your group insurance policy.

"However, because of the special circumstances involved here, we are agreeable to allowing benefits on the charges submitted as an exception and with the understanding that no further exceptions will be made under any circumstances for private duty nursing service in the home except that performed by and requiring the special knowledge and skills of a registered nurse. * * * "

We conclude and hold that the Tucker incident does not provide a basis for interpreting Equitable's policy in the manner contended for by plaintiff.

*Is plaintiff entitled to recover on a theory that by employing practical nurses when R.N.s were unavailable there has been substantial compliance with the policy provision with reference to private nursing service?*

■ It is plaintiff's position that he is entitled to recover in this case and that the judgment in his favor should be affirmed, even if we determine that the provision limiting coverage for private nursing service to that provided by R.N.s is plain and unambiguous. He urges that at the outset we were confronted with a threshold issue which was to determine the meaning of the contract. That we have done by holding the policy provision regarding private nursing services to be plain and unambiguous. Having so decided, plaintiff argues that we must now determine whether what occurred should be held to amount to substantial compliance by the insured with the provision as we have interpreted it.

In urging affirmance on the basis of substantial compliance,[5] plaintiff cites the cases of *Schoen v. American Nat. Ins. Co.*, 352 Mo. 935, 180 S.W.2d 57 (banc 1944) and *Hoffman v. Mastin*, 119 S.W.2d 1027 (Mo. App.1938). He argues that the doctrine of substantial compliance which he urges is consistent with and implicit in these two decisions.

*Schoen* was a suit to recover on a disability policy which required as a condition precedent to recovery of benefits that the insured personally furnish proof to the company of his disability. The insured became disabled by insanity and was unable to and did not file a proof of disability. Three years later, his guardian filed such proof but the company denied liability for the period preceding the time when proof was filed by the guardian. Citing and relying on Restatement of Contracts, § 301(b), this court concluded that impossibility of performance resulting from insured's insanity excused insured's failure to file proof of disability. The opinion pointed out that to hold otherwise would mean that such impossibility of performance would result in a forfeiture with no disability benefits being collected.

In *Schoen* the insured's insanity entitled him to disability benefits upon filing the necessary proof. There was no issue of coverage. Failure of compliance related to a purely procedural requirement. The court's holding merely *excused* compliance with that procedural requirement on the basis of impossibility of performance. It was not a substantial compliance case and is not authority for utilizing such a doctrine in this case.

*Hoffman* was a case wherein plaintiff sought recovery under a certificate issued by The National Health Foundation for amounts paid by him for hospitalization of his wife. The certificate sued upon provided as follows:

"All necessary hospital care and treatments (which shall consist of accommo-

**5.** Plaintiff's brief speaks of a doctrine of substantial compliance, that language having been used in at least one of the out-of-state cases relied on by plaintiff. He recognizes that it is based upon the doctrine of substantial performance.

dations in rooms with two beds), * * *."

Plaintiff obtained a judgment and defendant appealed. The issues presented on appeal included whether plaintiff should be denied recovery because (1) when his wife became ill, he arranged hospitalization for her instead of contacting the Foundation to do so and (2) there was no proof that the hospital accommodations utilized consisted of a two bed room. In disposing of these issues, the court concluded that by what had occurred the Foundation ratified what plaintiff did in securing hospitalization for his wife and, hence, could not complain that it had not arranged for the hospitalization. With respect to defendant's contention about noncompliance with the two bed room provision, the court said:

"Defendants contend plaintiff failed to prove that the accommodations for his said wife in the hospital were in rooms with two beds. This point is well taken. It was doubtless the purpose of this provision of the certificate to keep the hospitalization charge within the bounds of the usual and reasonable charge made for service where two patients occupy one room. There is evidence that Leona Hoffman entered Menorah Hospital; that she occupied a room therein; and that the charge therefor was $5 per day. The judgment of the trial court is based on this evidence, and is responsive thereto. There was also evidence that this was a reasonable charge for the service; but nowhere does it appear that this was a two bed room, or a one bed room, or a larger room. * * * Nor was there any evidence offered tending to prove what would be a reasonable amount per day as a charge for hospitalization in a two bed room in Kansas City. * * * But we think plaintiff should have been brought himself within the terms of the contract pleaded, either by showing that the room occupied was a two bed room and that the rate charged therefor was the usual and reasonable rate, or what the value of such service as is mentioned in the contract would have been if such

had been furnished by defendants." 119 S.W.2d at 1030.

The court in *Hoffman*, having concluded that the record on appeal did not establish whether plaintiff's wife had or had not occupied a two bed room in the hospital, reversed the judgment and remanded the case, stating that on remand plaintiff should offer proof on that subject. It did go on to say that if plaintiff's wife had not occupied a two bed room, plaintiff should offer proof as to what the reasonable cost of such a room would have been for the covered period of hospitalization. If what the court said in that regard with reference to approving payment for what would have been the charge for a two bed room is to be regarded as approval of a doctrine of substantial compliance with a policy provision, it should be noted that it was made in a case wherein cost rather than personal service was the issue. It is not a case which sustains a decision in favor of recovery by plaintiff in this case on a theory of substantial compliance.

Plaintiff also relies on four decisions from other states as supporting a finding for plaintiff on a theory of substantial compliance. The cases of *McKinney v. American Security Life Insurance Co.*, 76 So.2d 630 (La.App.1954); *Meyers v. Aetna Life Insurance Company*, 207 Pa.Super. 526, 218 A.2d 851 (1966) and *Hermitage Health and Life Insurance Co. v. Canter*, 57 Tenn.App. 532, 420 S.W.2d 654 (1967), involved issues of whether particular hospitals in which insured patients were placed and treated qualified as hospitals within the terms of the policies involved. They resolved such questions as whether there had to be strict compliance with policy provisions which in defining hospitals specified that they must have x-ray equipment or must have R.N.s on duty in the hospital 24 hours a day. In those instances, the courts concluded that the policy definitions of hospitals were intended to limit coverage to institutions generally accepted as meeting the requirements of a place to treat and care for the ill. The fact that a hospital had R.N.s during the day shifts but not at night or

that an x-ray machine was not in the hospital (but was available) did not cause the courts to conclude that these institutions were not hospitals. These cases dealt with details of institutional standards. Those questions are not comparable in our judgment with the one presented in this case. We are not persuaded that they are authority for holding that the work done by the practical nurses was substantially equivalent to that which R.N.s would have performed if they had been required and prescribed.

The other out-of-state case cited by plaintiff is *Continental Casualty Company v. Summerfield*, 87 Nev. 127, 482 P.2d 308 (1971). It did deal with whether the nursing services performed were provided by those nurses specified in the insurance policies. In that case, the policies covered the charge of "a visiting nurse at the residence" and went on to define a visiting nurse as one "accredited by the public health nursing agency located in the community where the Insured resides or is being treated." The court pointed out that there was no such agency in Nevada to accredit nurses. The power and authority to examine registered nurses and practical nurses was vested in the State Board of Nurse Examiners. The court then concluded, 482 P.2d at 311:

> "Since, under Nevada law, all nurses must be qualified and licensed prior to becoming visiting nurses, the placement of such power in an unauthorized agency is a nullity. We hold that a proper and liberal construction of the language of the policies requires the words 'visiting nurse' to include any registered or licensed practical nurse qualified under Nevada law. Cf. *Buske v. Federal Casualty Co.*, 200 Wis. 18, 227 N.W. 239 (1929) and *Reserve Life Insurance Company v. Marr*, 254 F.2d 289, 291 (9th Cir. 1958). Any other construction would render the contracts largely meaningless."

Thus, the court *construed* the policy provisions as including services of "any registered or licensed practical nurse qualified under Nevada law." The case was not decided on a theory of substantial compliance. It does not support plaintiff in this case.

■ Having decided that the policy provision in this case is clear and unambiguous and that plaintiff is not entitled to recover on a theory of substantial compliance, our obligation is to enforce the policy as written. As this court said in *State ex rel. Mutual Benefit, Health & Accident Ass'n v. Trimble*, 334 Mo. 920, 925, 68 S.W.2d 685, 688 (1934):

> " * * * If, therefore, no ambiguity or conflict existed under the terms of the policy, then a court had nothing to do but enforce the terms of the contract. Such has been the consistent holding of this court. In *Prange v. International Life Insurance Co.*, 329 Mo. 651, 46 S.W.2d 523, loc. cit. 526, 80 A.L.R. 950, this court said: 'Courts are without authority to rewrite contracts, even insurance contracts, although it may appear that in some respects they operate harshly or inequitably as to one of the parties; they discharge their full duty when they ascertain and give effect to the intentions of the parties, as disclosed by the contract which they have themselves made. *Interstate Business Men's Acc. Ass'n v. Nichols*, 143 Ark. 369, 220 S.W. 477; *State ex rel. v. Cox*, 322 Mo. 38, 14 S.W.2d 600; *State ex rel. v. Trimble*, 306 Mo. 295, 267 S.W. 876; *State ex rel. v. Trimble*, 297 Mo. 659, 249 S.W. 902; *Winters v. Insurance Co.*, 221 Mo.App. 519, 290 S.W. 109.' "

Judgment reversed.

All concur.